UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
SHAF INTERNATIONAL, INC.,

                          Plaintiff,

            - against -

FIRST MANUFACTURING CO. INC.,

                     Defendant.
------------------------------------------------------------x

**MEMORANDUM & ORDER**
20-CV-1242 (PKC) (ST)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Shaf International, Inc. has brought this action against Defendant First

Manufacturing Co. Inc. for selling garments in violation of Plaintiff's U.S. Patent No. 10,433,598

titled "Liner Access Means," issued on October 8, 2019 (the "Patent").  On June 3, 2021, the

parties submitted a list of terms in the Patent with disputed meanings.  (*See* Dkt. 51.)  The parties

subsequently briefed their respective proposed constructions of the disputed terms (*see* Dkts. 52,

54, 56), and the Court held a claim construction hearing on November 23, 2021.  As stated on the

record at the hearing, and in the Court's November 23, 2021 Memorandum and Order (Dkt. 57),

incorporated herein by reference, the Court adopts the following construction of the two remaining

disputed terms:

- **Back portion**: Portion of the outer layer that covers the entire back panel of the garment.

- **Substantially outermost extent**: At or near the boundaries.

      The Court issues this supplemental Memorandum and Order to provide the parties with its

written analysis for the construction of these two claim terms.

# BACKGROUND

## I.      Factual Background

Plaintiff designs, manufactures, and sells leather goods, including jackets and vests.  (*See* Complaint ("Compl."), Dkt. 1, ¶ 14.)  Plaintiff is the owner of the Patent titled "Liner Access Means," issued on October 8, 2019, by the U.S. Patent and Trademark Office (the "PTO").[1]  (*Id.* ¶ 11.)  The invention protected by the Patent is a lined garment; the liner has an opening, such as a zipper, that makes it easy to access the garment's fabric (or the "outer layer") to decorate the garment with, for example, embroidery, without detaching the liner from the outer layer.  (*See* Plaintiff's Opening Construction Brief ("Pl. Br."), Dkt. 52, at 2.)  An example of the invention is pictured below:



(Patent, Figure 4 (emphasis in red on the opening of the liner supplied by the Court).)

Defendant also manufactures and sells leather goods including jackets and vests.  (Answer ("Ans."), Dkt. 28, ¶15.)  On  May 18, 2017, Defendant filed patent application No. 15/599,014

---

[1] Before issuing the Patent, the PTO received a provisional patent application from Plaintiff on January 19, 2017 and a non-provisional patent application claiming priority to the provisional application filed by Plaintiff on July 6, 2017.  (Compl, Dkt. 1, ¶¶ 8, 9.)  The non-provisional application was published on October 26, 2017.  (*Id.* ¶ 10.)

titled "Lining System for Articles of Clothing," which sought to protect a similar invention that attached a lining that provides an opening (Dkt. 1-2, at ECF[2] 1), as pictured below:



(*Id.* (emphasis in red on the opening of the liner supplied by the Court).)  Shortly after submitting the patent application, Defendant started advertising garments lined with liners that have an opening for easy access to the garment.  (Compl., ¶¶ 18–19, 23; Ans., Dkt. 28, ¶¶ 18–19, 23.)  On October 18, 2019, the PTO issued a notice of abandonment in Defendant's patent application.[3] (*Id.*)

In  November 2017, Plaintiff sent a letter to Defendant advising Defendant of Plaintiff's Patent application and that Plaintiff would exercise legal rights available to it if and when the Patent issued.  (*See* Dkt. 1-4.)  In November 2019, after obtaining the Patent, Plaintiff sent another letter to Defendant asserting that Defendant was infringing the Patent and demanding information regarding infringing products in order to resolve the dispute without court action.   (*See* Dkt. 1-5.)

---

[2] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[3] On August 5, 2020, nearly five months after Plaintiff commenced this action, Defendant filed a petition to revive its patent application.  (*See* Dkt. 25.)

Defendant did not respond to Plaintiff's letters and this action followed.  (Compl., ¶ 22; Ans., Dkt. 28, ¶ 22.)

## II.   Procedural Background

On March 6, 2020, Plaintiff filed a complaint against Defendant asserting infringement of the Patent and false marketing, and seeking injunctive and monetary relief.  (Compl., ¶¶ 24–34, at 6.)  On May 27, 2020, the Clerk of Court entered a default against Defendant for failure to appear and/or defend.  (Dkt. 9.)  On June 11, 2020, Defendant's counsel filed a notice of appearance and a letter stating intent to file a motion to vacate the certificate of default and to stay default judgment-related discovery.  (Dkt. 12.)  Defendant then filed the motion to vacate (Dkt. 18), which Plaintiff opposed (Dkt. 21).  On August 18, 2020, the Honorable Steven Tiscione held a hearing and vacated the entry of default.  (*See* 8/18/2020 Minute Order.)

Defendant filed an answer on August 28, 2020, raising affirmative defenses and counterclaims against Plaintiff, and asserting, among other things, that the Patent is invalid and/or unenforceable.  (*See, e.g.*, Ans., Dkt. 28, ¶ 45.)  Plaintiff answered the counterclaims on September 18, 2020.  (Dkt. 33.)

On June 3, 2021, Plaintiff filed the parties' joint disputed claim terms chart.  (*See* Joint Disputed Claim Terms Chart ("Disputed Terms Chart"), Dkt. 51-1.)  Subsequently, Plaintiff filed its opening claim construction brief in July 2021 (*see* Pl. Br., Dkt. 52), Defendant filed its response in August 2021 (*see* Defendant's Brief ("Def. Br."), Dkt. 54), and Plaintiff filed a reply in September 2021 (*see* Plaintiff's Reply ("Pl. Rep."), Dkt. 56).  In their Disputed Terms Chart, the parties disputed the following nine terms: one that appears in claim 11—"completely enclose"— and eight others that all appear in claims 1, 11, and 16—"back portion," "first perimeter," "substantially outermost extent," "space," "within the first perimeter," "completely enclosed," "opening," and "permanently."  (*See* Disputed Terms Chart, Dkt. 51-1.)  During the course of the

claim construction briefing, however, the parties narrowed their dispute to the following two terms: "back portion" and "substantially outermost extent."[4]

On November 23, 2021, the Court held a claim construction hearing and on the same day issued a short Memorandum and Order setting forth the construction of "back portion" and "substantially outermost extent" to allow the parties to proceed with settlement discussions.  (*See* 11/23/2021 Minute Entry; Dkt. 57.)   On March 28, 2022, Judge Tiscione held a settlement conference, but the parties were unable to reach a disposition and therefore proceeded with discovery.  (*See* 3/28/2022 Minute Entry; 4/4/2022 Docket Order.)

## LEGAL STANDARD

The "determination of patent infringement requires a two-step analysis": (1) the Court first interprets the "claims to determine their scope and meaning" and (2) the factfinder then compares the "properly construed claims to the allegedly infringing device."  *Apex Inc. v. Raritan Comput., Inc.*, 325 F.3d 1364, 1370 (Fed. Cir. 2003).   Under *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996), "the construction of a patent, including terms of art within its claim, is exclusively within the province of the court."   Thus, "when the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016) (quotations omitted). The Court is "not bound by the parties' arguments as to claim construction."  *Sony Corp. v. Iancu*, 924 F.3d 1235, 1240 (Fed. Cir. 2019); *see also Exxon Chem. Pats., Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995) ("[T]he trial judge has an independent obligation to determine the meaning of the claims, notwithstanding the views asserted by the adversary parties.").

---

[4] At the November 23, 2021 claim construction hearing, the parties agreed that all other terms identified in the Disputed Terms Chart are no longer in dispute and do not require construction.

"[C]laims terms are generally given their ordinary and customary meaning. . . ." *Eon*, 815 F.3d at 1320. "The ordinary meaning of a claim term is not the meaning of the term in the abstract." *Id.* (citations and quotations omitted). "Instead, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* (citations and quotations omitted). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citation omitted). "To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning." *Id.* (quotations omitted). "The standard for disavowal of claim scope is similarly exacting." *Id.* at 1366 (quotations omitted). "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Id.* (quotations omitted); *see also Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298 (Fed. Cir. 2003) ("The written description must be examined in every case, because it is relevant not only to aid in the claim construction analysis, but also to determine if the presumption of ordinary and customary meaning is rebutted." (citation omitted)).

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*) (citation omitted*); see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012) ("The

district court did not err in concluding that these terms have plain meanings that do not require additional construction."). "In many cases that give rise to litigation, however, determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art." *Phillips*, 415 F.3d at 1314. Similarly, "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).

"In determining the proper construction of a claim, the court has numerous sources that it may properly utilize for guidance." *Vitrionics Corp. v. Conseptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)). Although these sources include both intrinsic and extrinsic evidence, courts must first look to all available intrinsic evidence, "*i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history,"[5] before considering any extrinsic evidence. *Id.* "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence." *Id.* (citations omitted).

## I.   Intrinsic Evidence

"In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." *Braintree*

---

[5] In its opposing brief, Defendant refers to the "file wrapper" without defining it. The Court construes this to mean the prosecution history of the Patent.

*Lab'ys, Inc. v. Novel Lab'ys, Inc.*, 749 F.3d 1349, 1354–55 (Fed. Cir. 2014) (quotation and alteration omitted); *see also Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("The appropriate starting point . . . is always with the language of the asserted claim itself." (citation omitted)).   "While certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms." *Brookhill-Wilk 1*, 334 F.3d at 1299 (citation omitted).

"Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313; *see also Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim." (citation omitted)).   "The importance of the specification in claim construction derives from its statutory role." *Phillips*, 415 F.3d at 1316.   "The close kinship between the written description and the claims is enforced by the statutory requirement that the specification describe the claimed invention in 'full, clear, concise, and exact terms.'" *Id.* (quoting 35 U.S.C. § 112).

Although "claims are to be interpreted in light of the specification," "limitations from the specification are not to be read into the claims." *Comark*, 156 F.3d at 1186 (quotations omitted). There is a "fine line between reading claims in light of the written description, and importing limitations from the written description." *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1322 (Fed. Cir. 2016).   "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear

8

intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (quotations omitted).

Likewise, "claims are not limited to preferred embodiments" identified in the specification "unless the specification clearly indicates otherwise." *WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1323–24 (Fed. Cir. 2018) (citation omitted). The specification's identification of a "preferred" embodiment thus can undermine the interpretation that the disputed claim term necessarily includes the features of that embodiment. *See Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008) ("[T]he specification states that 'preferably' none of these clays are added; this strongly suggests that absence of clays is simply a preferred embodiment."); *see also Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1357 (Fed. Cir. 2003) ("[U]se of the term 'preferably' makes clear that the language describes a preferred embodiment, not the invention as a whole.").

At the same time, "where claims can reasonably be interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence to the contrary." *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 983 F.3d 1367, 1378 (Fed. Cir. 2021) (citation, brackets, and emphasis omitted).  Thus, "[a] claim construction that does not encompass a disclosed embodiment is rarely, if ever, correct." *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1320 (Fed. Cir. 2005) (quotations and alteration omitted).  A court should reject a proposed construction that "would improperly read [one of the] embodiment[s] [described in the specification] out of the patent." *See Knowles*, 886 F.3d at 1375 (citation omitted).

"In addition to consulting the specification, . . . a court 'should also consider the patent's prosecution history, if it is in evidence.'" *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d

at 980).  "The prosecution history . . . consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent."  *Id.* (citation omitted).  "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent."  *Id.*  "[T]o disavow claim scope during prosecution a patent applicant must clearly and unambiguously express surrender of subject matter."  *Voda v. Cordis Corp.*, 536 F.3d 1311, 1321 (Fed. Cir. 2008) (quotations and citation omitted).

## II.    Extrinsic Evidence

"Extrinsic evidence is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles."  *Vitrionics*, 90 F.3d at 1584.  The Court may consider extrinsic evidence only if, after considering all of the intrinsic evidence, there is "still some genuine ambiguity in the claims."  *Id.* at 1582.  "The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely. In other words, competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention. Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as expert testimony, would make this right meaningless."  *Id.* at 1583 (citing *Markman*, 52 F.3d at 978–79).

"[E]ven if the judge permissibly decide[s] to hear all the possible evidence before construing the claim," extrinsic evidence which is "inconsistent with the specification and file history" should be accorded no weight.  *Id.* at 1584 (citations omitted).  "Any other rule would be unfair to competitors who must be able to rely on the patent documents themselves, without consideration of expert opinion that then does not even exist, in ascertaining the scope of a patentee's right to exclude."  *Id.* (citing *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995)).  "Nor may the inventor's subjective intent as to claim scope, when

unexpressed in the patent documents, have any effect. Such testimony cannot guide the court to a proper interpretation when the patent documents themselves do so clearly." *Id.*

However, "[a]lthough technical treatises and dictionaries fall within the category of extrinsic evidence, as they do not form a part of an integrated patent document," the Court is "free to consult such resources at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Id.*

## DISCUSSION

### I.    Claim Terms

The Patent contains three independent claims—1, 11, and 16.   Claim 1 of the Patent discloses:

A garment or accessory, comprising:

an outer layer having a **back portion** with an inner surface and an outer surface;

a liner positioned on the outer layer **back portion**, the liner having a first perimeter being a **substantially outermost extent** of the **back portion**, a portion of said first perimeter coupled to said inner surface, the liner and the outer layer at least partially coupled together permanently along the first perimeter;

a fastener, having a first member coupled to said inner surface and a second member coupled to said liner at an uncoupled portion of said first perimeter, with the fastener having a closed state when the first member engages the second member, and the fastener having an open state when the first member is disengaged from the second member;

a space formed between said liner and said inner surface within the first perimeter, wherein the space is completely enclosed when the fastener is in the closed state; and

an opening formed on the first perimeter when the fastener is in the open state, wherein the opening is positioned on the uncoupled portion between the liner and the outer layer;

11

wherein said space is accessible through said uncoupled portion.

(Patent col. 4–5 ll. 57–67, 1–15 (emphasis on disputed terms added).)

Claim 11 of the Patent discloses:

A garment or accessory, comprising:

an outer layer having a **back portion** with an inner surface and an outer surface;

a liner positioned on the outer layer **back portion**, the liner having a first perimeter being a **substantially outermost extent** of the **back portion**, and an opening formed on the first perimeter, the liner being at least partially coupled to the outer layer permanently along the first perimeter, wherein the opening is positioned on an uncoupled portion between the liner and the outer layer, and with a space formed between the outer layer and the liner within the first perimeter, the space being accessible through the opening; and

a fastener having a first member and a second member, with the fastener having a closed state when the first member engages the second member, and the fastener having an open state when the first member is disengaged from the second member, with the fastener operably coupled to the liner such that the opening is closable in the closed state of the fastener to completely enclose the space, and the opening is open in the open state of the fastener.

(Patent col. 5–6 ll. 39–49, 1–11 (emphasis on disputed terms added).)

Claim 16 of the Patent discloses:

A garment or accessory, comprising:

an outer layer having a **back portion** with a first inner surface and an opposing first outer surface;

an inner layer having a second inner surface, an opposing second outer surface, and a first perimeter being a **substantially outermost extent** of the **back portion**, the inner and outer layers at least partially coupled together permanently along the first perimeter, a space formed between the inner and outer layers within the first perimeter;

a fastener having a first member and a second member, with the fastener having a closed state when the first member engages the second member, with the space being completely enclosed when the fastener is in the closed state, and the fastener having an open state when the first member is disengaged from the second member; and

an opening formed on the first perimeter when the fastener is in the open state, wherein the opening is positioned on an uncoupled portion between the inner and outer layers.

(Patent col. 6 ll. 39–49, 23–43 (emphasis on disputed terms added).)

The Court construes the following two terms which appear in independent claims 1, 11, and 16 of the Patent, still in dispute among the parties: "back portion" and "substantially outermost extent."

## II.   Construction of "Back Portion"

Plaintiff recommends that the Court construe the term "back portion" to mean "portion of the outer layer that rests on the wearer's back and below."  (Disputed Terms Chart, Dkt. 51-1, at 1.)  Defendant argues that the term is incapable of construction and, in the alternative, recommends that the Court construe the term to mean "the part of the outer layer which rests solely on the wearer's back."  (*Id.*)  The parties thus seek to define the claim term in relation to the body of the person wearing the garment, and are in disagreement whether the back portion of the garment extends below the wearer's waistline.

The Court finds that the term "back portion" is capable of construction, declines to adopt Defendant's definition, and modifies Plaintiff's definition to avoid reference to the wearer's body, which can vary depending on the person.

### A.   Indefiniteness

Although Defendant argued, in the Disputed Terms Chart, that the term "back portion" is not capable of construction, it did not raise this argument either in its brief or at the claim construction hearing.  The Court finds that the term "back portion" is capable of construction and proceeds to construction analysis below.

### B.      Construction

Plaintiff argues that the term "back portion" covers the "back and below" of the garment's wearer because such interpretation is consistent with plain and ordinary meaning, and because the Patent's "specification and drawings describe and show a 'back liner 28' positioned on the back portion of the garment."  (Pl. Br., Dkt. 52, at 9.)  "Back liner 28" refers to Figures 3–6 in the Patent, which identify the garment's "back liner" as number 28: "[T]he closable access 32, 34, 36 could be located on other parts of the liner 20.  For example, the lower closable access could be positioned across a **back liner 28** at a mid-portion thereof."  (Patent col. 4 ll. 25–27 (emphasis added).)  See examples of the figures below:



(Patent, Figures 4, 6 (emphasis in red on "28" supplied by the Court).)  Plaintiff further argues that Figures 1 and 2 in the Patent "describe and show an outer layer 10, which incudes side portions as shown in Fig. 1 and a back portion as shown in Fig. 2."  (Pl. Br., Dkt. 51, at 10.)  See examples of the figures below:



(Patent, Figures 1, 2 (emphasis in red on "10" supplied by the Court).)

Plaintiff also points to the Patent's prosecution history, where Plaintiff sought to differentiate its invention from two examples of prior art, referred to as Smith and Epstein.  (Pl. Br., Dkt. 51, at 10–11.)  Plaintiff asserts that, when distinguishing its invention from Smith, Plaintiff argued before the PTO that the liner in Smith "does not extend to a substantially outermost extent of the back portion of the garment['s] or [sic] outer layer, as in the present invention."  (*Id.* at 11)  Similarly, in distinguishing its invention from Epstein, Plaintiff argued before the PTO that "Epstein does not have a liner or the inner garment 6 which extends on the entire back portion, as in the present invention."  (*Id.*)  In both of these examples of prior art, the "back portion" of the garment extends past a wearer's waistline.  See figures of the art below:

Smith:                                    Epstein:



(*Id.*)

The Court agrees with Plaintiff that the Patent's specification and drawings, as well as the prosecution history, support the interpretation that the term "back portion" refers to the garment's entire back panel, from top to bottom, and that the invention includes garments that extend below a wearer's waistline. As Plaintiff points out, the specification language refers to the entirety of the back liner and that, as depicted in Figure 4, the zipper ("closable access") is located at the bottom of the jacket, which, depending on the wearer's torso length, may or may not fall below the wearer's waistline.

Additionally, although not mentioned by Plaintiff, the specification supports Plaintiff's reading that "back portion" must cover the back of the jacket from top to bottom because the sentence refers to an alternative placement of the zipper in the middle of the jacket (as opposed to bottom): "For example, the lower closable access could be positioned across a back liner 28 at a **mid-portion thereof**." (Patent col. 4 ll. 25–27 (emphasis added).) Another sentence in the specification supports this reading: "In this embodiment [(referring to Figures 3-6)], a lower closable access 34 is positioned **along a lower seam** 44 of the garment 1 and is 17 inches in

16

length." (Patent col. 4 ll. 10–12 (emphasis added).) These two sentences, combined, imply that the "back portion" of the garment has a mid-portion and a lower portion. Thus, if the length of a garment extends below the wearer's waist to their "bottom," the lower seam/portion of the garment, where the closable access can be located, must necessarily extend beyond the wearer's waist too.[6]

This conclusion is supported by Plaintiff's arguments before the PTO regarding the prior art in Smith and Epstein, which illustrate that Plaintiff was using "back portion" to refer to the entire back panel of a garment. Defendant asserts that Plaintiff's arguments in the prosecution history focus on the positioning of the zippers, as opposed to what the term "back portion" encompasses. (Def. Br., Dkt. 54, at 8–11.) While it is true that Plaintiff's arguments in the prosecution history primarily focus on the placement of the zippers, it is also clear that both the Plaintiff and the PTO examiner understood the invention to encompass garments that can cover the wearer's back below the waist. Thus, the prosecution history provides additional context that

---

[6] To the extent Defendant's argument implies that the Patent protects garments that only cover the wearer's back up to the waistline, and any garment covering the wearers' back below that point is not protected, there is no support for this argument. First, the embodiments appear to illustrate garments that can extend below a wearer's waistline. And, in any event, the embodiments in the Patent are for illustrative purposes only and the specification states that the "invention could be applied to other garments with liners such as but not limited to jackets, blouses, pants and shorts." (Patent col. 3 ll. 31–33.) Moreover, the Federal Circuit has said that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co.*, 358 F.3d at 906 (quotations omitted). In *Liebel-Flarsheim*, for example, the court rejected the "argu[ment] that because all the embodiments described in the common specification of the . . . patents feature[d] pressure jackets, the claims of those patents must be construed as limited to devices that use pressure jackets." *Id.* at 905–06.

supports construction of the term "back portion" as the "portion of the outer layer that covers the entire back panel of the garment."[7]

## III.   Construction of "Substantially Outermost Extent"

Plaintiff recommends that the Court construe the term "substantially outermost extent" to mean "at or near the boundary of the portion of the outer layer that rests on the wearer's back and below." (Disputed Terms Chart, Dkt. 51-1, at 2.) Defendant again argues that the term "substantially" is incapable of construction and, in the alternative, recommends that the Court construe the term "substantially outermost extent" to mean "the furthest extent of the part of the liner which solely touches the wearer's back." (*Id.*) The parties once again seek to define the claim term in relation to the wearer's back and dispute whether the garment extends below the waistline.

The Court finds that the term "substantially" is capable of construction, declines to adopt Defendant's definition, and partially adopts Plaintiff's definition to avoid superfluity.

### A.   Indefiniteness

Defendant argues that the term "substantially" is indefinite, "completely absent from the specification," and that "there is no basis for determining just how close something might be to be

---

[7] Defendant argues that Plaintiff failed to offer "any admissible evidence regarding the manner in which one of ordinary skill would understand any term at issue" and insists that the Court should rely on Defendant's expert to construe the disputed terms. (Def. Br., Dkt. 54, at 2–6.) The Court disagrees. First, Plaintiff has offered intrinsic evidence—the claim language, the specification, and the prosecution history—which the Court has considered in construing the terms. *See, e.g.*, *CANVS Corp. v. United States*, 126 Fed. Cl. 106, 113 (Fed. Cir. 2016) ("The court need not rely on extrinsic evidence to learn how one of ordinary skill in the art at the time of invention would construe a claim if such perspective can be ascertained from the intrinsic record alone.") Second, because the meaning of the disputed terms is established by the intrinsic evidence, the Court need not, and does not, consider the expert affidavit presented by Defendant, *see Brookhill–Wilk*, 326 F.3d at 1225, which, in any event, is contradicted by the weight of the intrinsic evidence and therefore is not persuasive, *see Aerotel, Ltd. v. Telco Grp. Inc.*, 433 F. App'x. 903. 915 n.8 (Fed. Cir. 2011).

at the 'substantially outermost extent' of the back portion." (*See* Def. Br., Dkt. 54, at 7.) Defendant further argues that one of ordinary skill in the art would be "hopelessly lost in attempting to avoid infringement" in this instance because other terms in the sentence that include this phrase do not appear in the specification and the phrase is altogether "devoid of explanation or definition." (*Id.* at 7–8.) The Court completely disagrees.

"[T]he term 'substantially' is a descriptive term commonly used in patent claims to 'avoid a strict numerical boundary to the specified parameter.'" *See Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) (quoting *Pall Corp. v. Micron Seps.*, 66 F.3d 1211, 1217 (Fed. Cir. 1995). "[N]onnumerically limited descriptive claim terms are construed using the same rules of construction as any other claim term." *Id.* "That some claim language may not be precise, however, does not automatically render a claim invalid." *Seattle Box Co., Inc. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984). "When a word of degree is used[,] the district court must determine whether the patent's specification provides some standard for measuring that degree," *i.e.*, "whether one of ordinary skill in the art would understand what is claimed when the claim is read in light of the specification." *Id.*; *see also Andrew Corp. v. Gabriel Elecs. Inc.*, 847 F.2d 819, 821–22 (Fed. Cir. 1988) (observing that terms such as "approach each other," "close to," "substantially equal," and "closely approximate" are "ubiquitous in patent claims" and "[s]uch usages, when serving reasonably to describe the claimed subject matter to those of skill in the field of the invention, and to distinguish the claimed subject matter from the prior art, have been accepted in patent examination and upheld by the courts.").

Here, the term "substantially," although not specifically defined in the Patent, is not indefinite because it is not "presented in a vacuum" and can be construed based on definitional parameters or functional limitations set forth in the claims and specification. *See Ecolab, Inc.*, 264

F.3d at 1367 (citing *Laitram Corp. v. Cambridge Wire Cloth*, 863 F.2d 855, 858 (Fed. Cir. 1988)). The claims clearly state that the term "substantially" is tied to "outermost extent," which refers to the position of the liner with respect to the back portion of the garment.  (Patent col. 4 ll. 60–65 ("[A] liner positioned on the outer layer back portion, the liner having a first perimeter being a substantially outermost extent of the back portion, a portion of said first perimeter coupled to said inner surface, the liner and the outer layer at least partially coupled together permanently along the first perimeter.").)  Thus, the claim language itself explicitly ties the term "substantially" to the "coupling" of the liner and the garment.

Defendant cites to *Amgen, Inc. v. Chugai Pharmaceuticals Co.*, 927 F.2d 1200, 1218 (Fed. Cir. 1991), where the court found that the term "about" was indefinite, for the proposition that there is no "basis in the specification for determining the boundaries of the term of the degree" and that the term was therefore "indefinite and incapable of construction" (*See* Def. Br., Dkt. 54, at 7). But *Amgen* is inapposite here.  The patent there concerned a protein, erythropoietin ("EPO"), and a "new technique for producing EPO . . . from cell cultures into which genetically-engineered vectors containing the EPO gene have been introduced."  *Amgen, Inc.*, 927 F.2d at 1203.  The patent claimed homogenous EPO "characterized by a molecular weight of about 34,000 daltons on SDS PAGE, movement as a single peak on reverse phase high performance liquid chromatography and a specific activity of at least about 160,000 IU per absorbance unit at 280 nanometers."  *Id.*  The defendant challenged the district court's finding that the "specific activity limitation of 'at least about 160,000' was indefinite."  *Id.* at 1217.  "The district court found that 'bioassays provide an imprecise form of measurement with a range of error' and that use of the term 'about' 160,000 IU/AU, coupled with the range of error already inherent in the specific activity limitation, served neither to distinguish the invention over the close prior art (which

described preparations of 120,000 IU/AU), nor to permit one to know what specific activity values below 160,000, if any, might constitute infringement." *Id.* Among other things, "[t]his holding was further supported by the fact that nothing in the specification, prosecution history, or prior art provides any indication as to what range of specific activity is covered by the term 'about.'" *Id.* at 1218. The Federal Circuit affirmed the district court's declaration of the claims as invalid, but specifically cautioned that its holding did not "rul[e] out any and all uses of th[e] term" "about," which "may be acceptable in appropriate fact situations." *Id.*

Here, the specification provides clear and precise indications as to how the liner itself is positioned on the garment, namely along the seams of the garment. *Nautilus*, 572 U.S. at 901; (*see* Patent col. 3 ll. 44–47 ("The liner 20 includes an inner surface (not shown) and an outer surface 24, and is generally attached to the outer layer 10 of the garment *along [the] outer seams*." (emphasis added)); *id.* col. 4 ll. 10–12 ("In this embodiment, a lower closable access 34 is positioned along a lower seam 44 of the garment 1 and is 17 inches in length. The side closable accesses 32, 36 are positioned along side seams 42, 46 of the garment 1 and are 9 inches in length.").). Moreover, unlike in *Amgen*, this is not a highly scientific patent where the measuring unit related to the term "substantially" is inherently laden with a range of error that matters; here, the Patent concerns garments and liners that can be concretely and visually understood and reliably measured. Moreover, as Plaintiff points out, the prosecution history demonstrates that the term "substantially outermost extent" "was introduced in amendment" to distinguish the invention from prior art—Smith—where the liner only extends through half of the back portion of the garment (Pl. Rep., Dkt. 56, at 7):



(Pl. Br., Dkt. 51, at 11; Dkt. 52-3, at ECF 56 ("[T]he 'liner' 2 in Smith does not extend to a 'substantially outermost extent of the back portion' of the garment outer layer, as in the present invention. . . . The opening is . . . not at or near the stitching . . . [and] not on the stitching.").)

The Court therefore finds that "those skilled in the art would understand what is claimed,"[8] *Amgen*, 927 F.2d at 1217, and proceeds to construing the term "substantially outermost extent."

## B.   Construction

Plaintiff recommends that the Court construe the term "substantially outermost extent" to mean "at or near the boundary of the portion of the outer layer that rests on the wearer's back and below." (Disputed Terms Chart, Dkt. 51-1, at 2.)  Plaintiff argues that its construction is supported by (1) dictionary definitions of each word of the phrase and (2) the prosecution history where

---

[8] Plaintiff argues that even Defendant's own expert testified that "substantially" is commonly understood as "almost" and the term "substantially outermost extent" can be understood to mean "almost at the outermost extent."  (Pl. Rep., Dkt. 56, at 8.)  Because the Court decides the construction of the disputed claim terms based on intrinsic evidence, it does not rely on any extrinsic evidence, including Defendant's expert's affidavit.   Nonetheless, it bears note that even Defendant's own expert contradicts Defendant's non-construability argument.  (*See* Deposition Transcript of Dobriana Gheneva, Dkt. 56-3, 84:9–12 ("Q. Okay. Now when I say "substantially outermost extent," what does that mean to you? A. Almost at the outermost extent.").)

Plaintiff distinguished its invention from Smith because in Smith, the liner only extended to the mid-point of the jacket, not near its boundaries.  (Pl. Br., Dkt. 52, at 12–14.)

Defendant recommends that the Court construe the term "substantially outermost extent" to mean "the furthest extent of the part of the liner which solely touches the wearer's back." (Disputed Terms Chart, Dkt. 51-1, at 2.)   Defendant argues that Plaintiff is "attempt[ing] to shoehorn the unrelated argument [regarding Smith] made in its response to fit into its arguments [in] support [of] its proposed definition" because "the argument being made in the response did not have anything to do with whether the rear liner (not "portion" as claimed) 28 shown in the '598 Patent extends below the wearer's waist."  (Def. Br., Dkt. 54, at 11.)

As already discussed, the claim language clearly indicates that the term "substantially outermost extent" refers to the position of the liner with respect to the back portion of the garment. (Patent col. 4 ll. 60–65 ("[A] liner positioned on the outer layer back portion, the liner having a first perimeter being a substantially outermost extent of the back portion, a portion of said first perimeter coupled to said inner surface, the liner and the outer layer at least partially coupled together permanently along the first perimeter.").)   And the specification provides a clear indication as to how the liner itself is positioned on the garment, namely along its seams.  (*See id.* col. 3 ll. 44–47 ("The liner 20 includes an inner surface (not shown) and an outer surface 24, and is generally attached to the outer layer 10 of the garment *along [the] outer seams*." (emphasis added)); *id.* col. 4 ll. 10–12 ("In this embodiment, a lower closable access 34 is positioned along a lower seam 44 of the garment 1 and is 17 inches in length. The side closable accesses 32, 36 are positioned along side seams 42, 46 of the garment 1 and are 9 inches in length.").)

The Court thus finds that "substantially outermost extent" refers to the boundaries of the garment, as Plaintiff suggests.[9]   However, Plaintiff's proposed construction—"at or near the boundary of the portion of the outer layer that rests on the wearer's back and below"—is superfluous because the language of the claim already refers the reader to the "substantially outermost extent of the back portion" and the Court has defined "back portion" as the "portion of the outer layer that covers the entire back panel of the garment."

In *Digital-Vending Services International, LLC v. University of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012), for example, the Federal Circuit reversed the district court's redundant construction of the claim term "registration server," as a server "free of content managed by the architecture," because the disputed claim already "characterized" a "registration server" as "free of content managed by the architecture."  The Court explained that "[i]f 'registration server' were construed to inherently contain the 'free of content managed by the architecture' characteristic, the additional 'each registration server being further characterized in that it is free of content managed by the architecture' language in many of the asserted claims would be superfluous." *Id.*  A similar superfluity issue arose in *Enthone Inc. v. BASF Corp.*, where the disputed claim disclosed "a polyether suppressor compound comprising a combination of [certain identified chemical properties]."  No. 15-CV-233 (TJM) (DEP), 2016 WL 6679493, at *4 (N.D.N.Y. June 17, 2016), *report and recommendation adopted*, 2016 WL 4257355 (N.D.N.Y.

---

[9] Defendant also states that in Smith, the "[c]losable access 34 is depicted at the bottom of the rear panel, at a location which would be above the wearer's waist, while closable accesses 32 and 36 are on side panels which are also above the wearer's waist."  (Def. Br., Dkt. 54, at 11.) First, the Court declines to interpret any of these terms in relation to the wearer's body which, as discussed, would depend on the particular person's build.  Second, Plaintiff specifically distinguished Smith by arguing that the liner in Smith "does not extend to 'a substantially outermost extent of the back portion of the garment's outer layer, as in the present invention." (*See* Dkt. 52-3, at ECF 56.)

Aug. 11, 2016). Using essentially identical language, the defendant "propose[d] that the term 'suppressor' be construed to mean 'a compound comprising a combination of [those identified chemical properties]." *Id.* at *6. The court rejected this proposed construction as superfluous, because adopting it would result in the disputed claim effectively disclosing "a compound comprising a combination of [certain identified chemical properties] comprising a combination of [those identified chemical properties]." *Id.* (citation omitted). *See also Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1304 (Fed. Cir. 2007) ("The fact that [certain] functions are mentioned separately when a 'server' is mentioned in the claims weighs against limiting a 'server' to one that performs the functions.").

Similarly here, if the Court were to adopt Plaintiff's recommended construction, the term "substantially outermost extent of the back portion" would read as "at or near the boundary of the portion of the outer layer that rests on the wearer's back and below of the portion of the outer layer that covers the entire back panel of the garment." The proposed definition plainly would be redundant and confusing. Accordingly, the Court finds the language in Plaintiff's proposal, "of the portion of the outer layer that rests on the wearer's back and below," to be superfluous, and instead construes "substantially outermost extent" to mean "at or near the boundaries." This construction adopts the first part of Plaintiff's proposal, but changes "boundary" to "boundaries," because a garment has multiple sides and edges and therefore more than one boundary (*i.e.*, right, left, top, and bottom) where the liner and the outer layer meet.

\* \* \*

Thus, the term "substantially outermost extent of the back portion" reads as "at or near the boundaries of the portion of the outer layer that covers the entire back panel of the garment."

## CONCLUSION

Having reviewed the parties' proposed constructions, the Patent, and the relevant intrinsic evidence, the Court construes the terms "back portion" and "substantially outermost extent" as follows: (1) "back portion" – <u>portion of the outer layer that covers the entire back panel of the garment</u>; (2) "substantially outermost extent" – <u>at or near the boundaries</u>.

SO ORDERED.

/s/ *Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: July 15, 2022
      Brooklyn, New York